## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Bradley Fearn ("Affiant"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a criminal complaint and arrest warrant for Dr. Ankita Singh ("Singh"), year of birth 1982, charging violations of 18 U.S.C. §§ 1347 and 1349 and Title 42 U.S.C. §§ 1320a-7b. Specifically, I have probable cause to believe that Singh knowingly and willfully signed medically unnecessary orders for patients that she did not know or treat for orthotic braces and supplies which caused Medicare to be billed more than $8.4 million from about June 2018 through May 2021. I also have probable cause to believe that Singh knowingly and willfully accepted remunerations of more than $70,000 in exchange for ordering these orthotic braces and supplies to which Medicare paid more than $4.4 million to orthotic brace suppliers.

2.      I am a Special Agent employed by the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), Office of Investigations ("OI"). I have been so employed since 2019.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      In 2008, I became a Special Agent of the Diplomatic Security Service assigned to conduct United States Visa and Passport fraud investigations.  In 2017, I became a Criminal Investigator Deputy United States Marshal assigned to investigate fugitive apprehensions as well as interstate sex offender registration violations.

4.      In 2009, I completed the Criminal Investigator Training Program at the Federal

Law Enforcement Training Center (FLETC) in Glynco, Georgia. Also, in 2009, I competed Special Agent Basic Training with the Diplomatic Security Service at the Diplomatic Security Training Center in West Virginia. In 2017, I completed the Basic Deputy U.S. Marshal course at FLETC. I also received specific training in health care fraud investigations from the National Training Enforcement and Operations Branch of HHS/OIG/OI. I have led multiple health care fraud investigations and I have led or am leading four separate investigations into the specific type of fraud discussed in this affidavit.

5.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. The facts set forth in this affidavit come from my personal involvement with this investigation, interview with witnesses and my review of documents – including bank records, Medicare data, electronic signature records and other materials obtained through subpoenas, court orders, and search warrants.

## OVERVIEW

3.      At all times relevant herein, the following facts are true to the best of my knowledge and belief:

**Dr. Ankita Singh ("Singh") caused high Medicare billing for prosthestic/Orthotic durable medical equipment prosthestics, orthotics, and supplies ("DMEPOS") referrals/prescriptions, amounting to over $8,448,115.91 million between June 4, 2018 and May 24, 2021.**

## THE MEDICARE PROGRAM

6.      Congress established the Medicare program ("Medicare") under Title XVIII of the Social Security Act. Medicare is a federal health care program that provides benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States

Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is a health care benefit program as defined by 18 U.S.C. § 24(b).

7. Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. Specifically, Medicare Part B covers medically necessary physician office services, including the ordering of Durable Medical Equipment Prosthetics/Orthotics, and Supplies ("DMEPOS"). Medicare Part C covers the same benefits as Medicare Part B including DMEPOS. CMS contracts with private insurance companies called Medicare Administrative Contractors ("MACs")[1] to, among other things, process individual Medicare claims and to determine the appropriate level of reimbursement.

8. The Balanced Budget Act of 1997 ("BBA") established a new Part C of the Medicare program, known today as the Medicare Advantage Plans ("MAP"). CMS was authorized to contract with public or private organizations to offer a variety of health plan options for beneficiaries, including coordinated care plans such as: health maintenance organizations (HMOs), provider sponsored associations (PSOs), and preferred provider organizations (PPOs)), Medicare Medical Savings Account (MSA) plans, private-fee-for-service (PFFS) plans, and Religious Fraternal Benefit (RFB) plans. These health plans provide all Medicare Parts A and B benefits, and most offer additional benefits beyond those covered under the Original Medicare program. A MAP is a health care benefit program as defined by 18

---

[1] A Medicare Administrative Contractor (MAC) is a private health care insurer that has been awarded a geographic jurisdiction to process Medicare Part A and Part B (A/B) medical claims or DME claims for Medicare Fee-For-Service (FFS) beneficiaries.

U.S.C. § 24(b).

9.      DMEPOS generally refers to equipment that provides a therapeutic benefit or enables a patient to perform tasks that one is unable to otherwise undertake.  Some DMEPOS examples relevant to this Affidavit are back braces, knee braces, shoulder braces, and wrist braces.

**MEDICARE PAYMENT FOR DURABLE MEDICAL EQUIPMENT**

10.      Section 1847(a)(2) of the Social Security Act defines Off-The-Shelf ("OTS") orthotics as those orthotics described in section l86l(s)(9) of the Act for which payment would otherwise be made under section l843(h) of the Act, which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual.  Orthotics that are currently paid under section 1834(h) of the Act and are described in section 1861(s)(9) of the Act are leg, arm, back, and neck braces.  The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the longstanding Medicare definition of "braces."  Braces are defined in this section as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

11.      To receive reimbursement from Medicare for non-physician items such as OTS orthotics, a DMEPOS supplier is required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92.  Claim forms require important information, including: (a) beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered the OTS orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

12.     By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement.  They also sign an acknowledgement that failure to follow these rules could results in criminal and civil penalties.  To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.  Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

13.     Health care providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered.  Medicare would not pay claims procured through kickbacks and bribes.

14.     Medicare requires the supplier for all DMEPOS supplies to keep on file a physician prescription (order).[2]  A supplier must have an order from the treating physician before dispensing any DMEPOS item to a beneficiary. Before submitting a claim for an orthotic brace to the DME MAC, a supplier must have on file patient medical records which contain sufficient documentation of the patient's medical condition to substantiate the necessity for the type and quantity of items ordered and for the frequency of use or replacement.[3]  The information should include the patient's diagnosis and other pertinent information including but not limited to, duration of the patient's condition, clinical course (worsening or improvement), prognosis, nature and extent of functional limitations, other therapeutic interventions and results, and past experience with related items.

---

[2] Medicare Program Integrity Manual, Chapter 5, Rev. 834, 10/12/2018, section 5.2.1- Physician Orders
[3] Medicare Program Integrity Manual, Chapter 5, Rev. 834, 10/12/2018, section 5.2.2 and 5.7

15.     Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records for seven (7) years from the date of service,[4] reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare, through Medicare contractors, to review the appropriateness of Medicare payments made to the health care provider.

16.     Absent a valid certification or order by the treating physician, Medicare lacks the statutory authority to pay a claim for providing braces to a beneficiary.  See 42 U.S.C. § 1395n(a)(2)(b); 42 U.S.C. § l395y(a)(l ) ("No payment may be made for any expenses incurred for items or services...which are not reasonable and necessary for the diagnosis or treatment of illness or injury.").  A treating physician is a physician, as defined in 42 U.S.C. § 1395(r), who furnishes a consultation or treats a beneficiary for a specific medical problem, and who uses the results of a diagnostic test in the management of the beneficiary's specific medical problem.[5]

17.     In addition, any DME suppliers who pay illegal kickbacks for packaged doctor's orders or "leads" are violating the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and committing health care fraud. 18 U.S.C. § 1347.

**TELEMEDICINE**

18.     Telemedicine regulations are covered in 42 Code of Federal Regulations §410.78

---

[4] 42 CFR section 424.516(f).
[5] A "treating physician" is referenced in the Medicare Benefit Policy Manual Chapter 15.

– Telehealth Services.

19.     Telemedicine provided a means of connecting patients to health care providers by using telecommunications technology, such as video or the telephone.

20.     Telemedicine companies hired physicians and other health care providers to furnish telemedicine services to individuals.  Telemedicine companies typically paid health care providers a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically billed the health insurance companies.

21.     Medicare Part B covered telehealth expenses services if certain requirements were met: (a) the beneficiary was located in a rural area (outside a Metropolitan Statistical Area or in a rural health professional shortage area); (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified type of medical facility — not at a beneficiary's home — during the telehealth service furnished by a remote practitioner.

22.     Medicare Part B pays for covered telehealth services included on the telehealth list when furnished by an interactive telecommunications system except that for the duration of a Public Health Emergency.  There has been a continuing determination that a public health emergency exists nationwide as the result of the 2019 Novel Coronavirus that began on January 31, 2020, and continues to present day, having last been renewed on January 14, 2022.[6]  Under the emergency declaration and waivers, these telehealth services may be provided to patients by physicians and certain non-physician practitioners regardless of the patient's location.[7]

23.     CMS has used its waiver authority to allow, beginning on March 1, 2020,

---

[6] https://aspr.hhs.gov/legal/PHE/Pages/COVID19-14Jan2022.aspx - Renewal of Determination That A Public Health Emergency Exists.
[7] https://www.cms.gov/files/document/03092020-covid-19-faqs-508.pdf - COVID-19 Frequently Asked Questions (FAQs) on Medicare Fee-for-Service (FFS) Billing.

telephone evaluation and management codes and certain counseling behavioral health care and educational services, to be furnished as telehealth services using audio-only communications technology (telephones or other audio-only devices).

## ELECTRONIC SIGNATURE STORAGE PROVIDER

24.     DocuSign is a cloud-based service that allows users to sign documents securely and electronically across multiple platforms and operating systems after users authenticate themselves in the cloud.  An electronic signature or e-signature lets people sign documents online, instead of using pen and paper.  DocuSign records allow users to determine, among other things, the precise times when documents are opened, viewed, and signed.  DocuSign also creates a log of the signature which can be used to verify the signature authenticity for each document. eSignature is widely recognized as legally binding in the many other areas of the world to include the United States.  DocuSign allows for companies to send documents for eSignatures online, track the progress of requests, and get documents signed directly from their device.

25.     DocuSign's verification log for a document is called an Envelope.  Each DocuSign Envelope contains a unique identifier, Subject, total number of pages, total number of certificate pages, time zone, Envelope originator mailing address, Envelope originator email address, Envelope originator IP address, signer name, signer email address, signature adoption (how the signature was captured), signer IP address, timestamps of all events such as viewing and signing, a consumer disclosure from the Envelope originator, and other tracking information. The consumer disclosure often included instructions for contacting the Envelope originator.

26.     As part of the signature log, DocuSign documented if a user used a mobile device such as a cell phone or tablet to sign the document. DocuSign also logged the type of signature

used. Users could draw a signature on their mobile device or instead use a handful of pre-determined font sets to represent their signature.

## PROBABLE CAUSE

27.     I respectfully submit this affidavit believing there is probable cause that Ankita Singh committed violations of Title 18, United States Code Sections 1347 (Health Care Fraud) 1349 (Conspiracy to Commit Health Care Fraud), and Title 42 United States Code Section 1320a-7b (Anti-Kickback Statute)

## INVESTIGATIVE BACKGROUND

28.     Together with an agent from the Federal Bureau of Investigation, I am currently investigating Dr. Ankita Singh ("Singh") for the above listed federal offenses.

29.     In August 2021, an analysis of Singh's Part B DMEPOS Medicare referrals conducted by the U.S. Department of Health and Human Services, Office of Inspector General, found that Singh had caused Medicare to be billed for more than $8.4 million through her referrals. Of these referrals, Singh had zero claims for any professional services rendered for all but 9 of the 3,168, or 99.7%, of individuals who were referred for DMEPOS services. This indicates that Singh had virtually no prior relationship with the beneficiaries and was not their treating physician. Investigations by other jurisdictions into the DMEPOS companies that submitted claims where Singh was the referring provider showed that it was common for marketing firms to identify Medicare beneficiaries through various means, such as cold calls and television advertisements, and then contract with and pay providers such as Singh to obtain signed prescriptions for DMEPOS. These providers often have no prior relationship with the patient and often never consulted with the beneficiary regarding the medical necessity of the DMEPOS product.

30.     Singh has been licensed to practice medicine in the state of Ohio, as a Doctor of Medicine, since June 8, 2016, license number 35.128903.  Singh has also been licensed to practice medicine in the state of Arizona as a Doctor of Medicine, license number 62250, as of February 26, 2021.  Singh also possessed her DEA license to prescribe controlled substances, license number FS6059174, as of June 2016.  Singh became an approved Medicare provider on September 28, 2016, with a National Provider Identifier (NPI) number of 1265870935.

31.     From June 2018, through May 2021, Singh was listed as the referring physician on 5,960 claims for 3,168 beneficiaries related to DMEPOS billings of $8,448,115.91 to Medicare with Medicare paying $4,484,777,16.  For those patients which she had no prior Part B billings (i.e., relationship), there were 5,939 claims for 3,159 beneficiaries and a total of $8,425,684.69 in billings. Medicare paid $4,471.920.17 for these claims.  This further substantiates that approximately 99.7% of the billings and payments related to these DMEPOS claims were from beneficiaries that Singh had no prior part B relationship.  During the same period, HHS-OIG conducted an analysis of the top 100 Ohio providers who made DMEPOS referrals that were billed to Medicare.  Only eight (8) of the top one hundred (100) providers were found to have billings with no prior part B relationships more than 40% of the time.  Their average no prior part B relationship billing percentage was 96.87%.  The other 92 providers only had an average of 7.71%.  Additionally, seven (7) of the (8) providers mentioned above are or were under investigation in this or other jurisdictions for a similar DMEPOS fraud scheme.

32.     Patients identified through Medicare billing with referrals for DMEPOS which were signed by Singh had Medicare claims submitted through approximately 213 DME companies.  In my experience, this is unusual because providers traditionally have a small set of DME companies that commonly fill their orders.

33. Thirty-six (36) Medicare beneficiaries, who had received a DMEPOS referral from Singh (or their respective caretakers with intimate knowledge of their medical history) were interviewed by the FBI and HHS-OIG. None of the beneficiaries or caretakers interviewed had any knowledge of ever meeting or speaking with Singh. Of the 36 interviewed, 27 received at least one orthotic brace in the mail. Of the 36 interviewed, 29 confirmed they did not want, need, or request at least some of the DMEPOS that Singh ordered. 31 of those interviewed also reported receiving telephone calls from unknown callers or people purporting to be from Medicare asking if they were in pain and/or needed or wanted medical braces prior to them receiving DMEPOS in the mail and/or Medicare being charged for braces.

34. Based on a review of bank records, Singh was employed by a primarily Locum Tenens company, "BA". BA also purported to provide telemedicine services. An associated business to BA's telemedicine services was "RTP". BA and RTP are known to be under federal investigation in another jurisdiction relating to their telemedicine business as it relates to fraudulent DMEPOS orders, among other allegations. Singh was likely receiving kickbacks from BA in the form of consultation fees for signing off on DMEPOS referrals for patients with whom she had no prior Medicare Part B billing for professional services, i.e., no established doctor-patient relationship, in violation of Medicare regulations.

35. On November 12, 2020, your affiant reviewed public records related to Singh. Singh's date of birth was listed as June xx, 1982, and her Social Security Number was listed as xxx-xx-6639. Her current address was listed as 3428 Swan Ridge Ln, Maumee, OH. Some of the email addresses listed were dr.ankitasingh@gmail.com, anki_155@yahoo.com, and tcpenna@aol.com.

36. On October 16, 2020, your Affiant reviewed records held by the State of Ohio.

Singh's date of birth was listed as June xx, 1982, her Social Security Number was xxx-xx-6639, and an address was listed of 3428 Swan Ridge Ln, Maumee, OH.

37.     Department of Homeland Security ("DHS") records show that Singh is a Lawful Permanent Resident, with Alien registration number xxxxxx771.  Singh's country of citizenship is India. Her Indian passport number is Sxxxxxxx. Records also showed that Singh departed the United States on November 20, 2019, and did not return until December 8, 2019.

38.     A sampling of DocuSign records showed that Singh signed 10 Envelopes for DME orders on November 22, 2019.  Her signature was drawn on the device and she used a mobile device for all these Envelopes.  All of the records had at least one beneficiary name in the subject line along with the type of brace(s).  Singh applied a staggering 234 electronic signatures to seven (7) Envelopes in a period of only 23 minutes.  Earlier in the day, Singh applied 201 signatures in only 12 minutes. Envelope ID 8F2A5DA22B0346A58C11D8D4D297CAA9 indicated the underlying document was 247 pages long and had 171 signatures.  Singh only had the document open for nine and a half minutes.  Your affiant believes it is unlikely for a person to be able to even skim 247 pages in that amount of time.  Your affiant believes that Singh signed these orders while in India based on the location of the Internet Protocol ("IP") captured during the signature events.  IP is discussed in more detail later in the affidavit.

39.     A review of Singh's Medicare Enrollment data listed Singh's date of birth as June xx, 1982, her Ohio Medical License number of 35.xxxxxx, a medical records storage facility at 4235 Secor Rd Toledo, OH effective August 1, 2019, reassignment of benefits to Toledo Clinic, Incorporated as of August 1, 2019, and subsequent reassignment of benefits to Hospitalist Medicine Physicians of Ohio-TCG, Professional Corporation as of November 1, 2019.

40.     The Medicare contractor responsible for program integrity referred Singh to HHS-

OIG in September 2020 regarding her referrals for DMEPOS. The contractor interviewed three (3) beneficiaries. The three (3) beneficiaries denied having any knowledge of Singh, confirmed they received an unsolicited telephone call offering the DMEPOS prior to receiving them, and did not receive a medical exam prior to receiving the DMEPOS. Singh was referred to HHS-OIG based upon established referral guidelines of beneficiaries having no prior relationship with the referring physician, suspicion of telemarketing, and phone solicitation for DMEPOS to the beneficiaries.

41. In April 2021, agents received information regarding an investigation into DMEPOS and laboratory orders for "H-MAP" members signed by Singh. H-MAP provides MAP benefits to eligible beneficiaries who elect their coverage. H-MAP determined, based on interviews of three (3) H-MAP beneficiaries in or around January 2021, that Singh was participating in a tele-solicitation scheme to sign DME and laboratory orders that were not medically necessary for patients with whom Singh had not established a doctor-patient relationship. As part of the investigative activities, your affiant sent a Request for Information (RFI) to H-MAP on April 13, 2021, requesting the contents of their investigation into Singh. H-MAP responded on April 14, 2021, with, among other items, an education letter sent to her listed Medicare address on 5757 Monclova Rd. #15 Maumee, OH by a H-MAP investigator.

42. The education letter sent by the H-MAP Investigator was dated February 11, 2021. The stated findings in the letter were that Singh ordered DME and/or genetic laboratory services for H-MAP members, which H-MAP had no record of Singh conducting examinations. The letter told Singh this was indicative of participation in the telemedicine/telemarketing scheme. Singh ordered DME/Lab services for 112 members through 251 claims. The top three (3) codes ordered were L2397 (OTS knee sleeve) for 49 members, L1851 (OTS knee orthotic)

for 40 members, and L0648 (OTS back orthotic) for 39 members.  Singh was reminded of Medicare regulations requiring all DME, even that via telehealth services, must be medically necessary. Singh was advised of the False Claims Act 31 U.S.C. Sections 3729-3733.

43.     Claims data reviewed by your affiant showed that after February 19, 2021, there were $363,141.97 worth of submitted claims for DMEPOS referrals from Singh.  Medicare paid $198,308.47 on these claims.

44.     DocuSign provided investigators with 1,434 items pursuant to a court order issued on November 17, 2020.  There are 717 unique Envelope IDs contained within the production by DocuSign.  The other 717 items are a less detailed log file of only the sent/view/signed transaction logs.

45.     Further analysis found 716 of 717 Envelopes had the email address dr.ankitasingh@gmail.com in the Signer Events section.  The Signature Adoption method used for 553 of the 717 Envelopes was "Drawn on Device," while 54 used a "pre-selected style," or font to simulate a handwritten signature.  Your Affiant believes "Drawn on Device" to mean that the DocuSign user physically draws a signature on the device they are using in order to sign the electronic document.  The signed Envelopes contained the image of the drawn signature. An example is as shown here  .  Your Affiant verified that the signature appears very similar in each of the Envelopes, but that each signature is not exactly the same.  This is reasonable because it can be difficult to replicate one's signature precisely, especially when drawing on an electronic device.

46.     In 582 of the 717 Signature fields of the Envelopes the phrase "Signed using mobile" appears.  DocuSign uses information captured during the transaction to determine the type of device used to sign documents.  Your Affiant believes it is common for website and other

internet-based technologies to be able to know what operating system and type of device is used to access their information in order to provide tailored content. Your affiant believes Singh used a mobile device to sign these 582 Envelopes.

47.     The Internet Protocol ("IP") address captured during 387 of the 717 Envelope signatures was 162.224.208.167 ("IP1").

48.     Envelope originators can enter a subject line for the document submitted for electronic signature. 180 of the 717 Envelopes had a subject line containing the word "knee." 122 of the 717 contained the word "ankle." 206 of the 717 contained a patient name along with the type of brace ordered.  Selected examples are below.

    a.  Envelope ID:  C2068615D6AD4954A602CE51436A8D64, signed on May 13, 2019. Subject line:  Please DocuSign: [M.C.] BACK OH.pdf, [M.C.] BI KNEE OH.pdf, [M.C.] R SHOUL…[8]

    b.  Envelope ID:  EA0393D3DBEB40FCBCDA0FAAFD04C0BB, signed on September 17, 2019. Subject line:  Please DocuSign: [B.W.]_BACK_OH_.pdf, [B.W.]_BOTH_ANKLE_OH_.pdf, [B.W.]_BOTH_...

    c.  Envelope ID:  B9B552DF3950476883763B9EAE8F880E, signed on November 28, 2019. Subject line:  Please DocuSign: [B.G.] __BACK_OH_1.pdf, [B.G.]_BI_KNE…

    d.  Envelope ID:  3BFF213C478F4C9FB736B2198F80DFDA, signed on September 23, 2019. Subject line:  Please DocuSign: [R.I.]_BACK_OH_DASSR 1.pdf, [R.I.]_BOTH_KNEE_OH_DASSR 1.pdf.

    e.  Envelope ID:  4B3EECEEE1E64B21BDAF4995C6753EF4, signed on November 13, 2019. Subject line: Please DocuSign: [A.H.]__BACK_OH_6.pdf, A.H.]_BI_KNEE_OH_6.pdf, [A.H.]_RI...

---

[8] Each of the identified patients' full names were included in their respective DocuSign file names and attachments, but their initials have been substituted here in brackets to protect their identity.

49.     Medicare records showed that Singh was the referring provider for one L0650 back brace, two L1851 knee braces, two L2397 suspension sleeves, and one L3960 shoulder-elbow-wrist brace for Patient M.C.  The diagnoses were spondylosis without myelopathy, lumbar region for the back brace, other spontaneous disruption of the posterior crucial ligament for the knee braces, and sprain of right rotator cuff capsule for the shoulder brace.  DME suppliers submitted claims for these braces between May 23, 2019 and May 29, 2019, in the amount of $4,782.61, about ten days after C2068615D6AD4954A602CE51436A8D64 was electronically signed using IP1.  Medicare paid $3,160.40 on these claims.

50.     M.C. was interviewed by the FBI and HHS-OIG on February 8, 2022.  M.C. received a phone call from someone saying they were from Medicare and offering free braces.  M.C. suffers from Limb Girdle Muscular Dystrophy, a terminal condition.  M.C. told the caller he had pain in his back, knees, and shoulder and agreed to receive the free braces for these areas.  Soon after the call, he received a package containing these braces.  The braces were too cumbersome that M.C. believed they were more dangerous than not having them on at all and discontinued using them after one or two tries.  M.C. does not have any posterior cruciate ligament issues in his knee.  He does not have a sprain in either of his rotator cuffs.  M.C. does not have spondylosis in his lower back.  M.C. does not know who Singh is and denied having a consultation with her.

51.     Medicare records showed that Singh was the referring provider for two L1971 ankle braces, two L3170 heel stabilizers, one L0648 back brace, two L1851 knee braces, two L2397 suspensions sleeves, and two L3916 wrist hand braces for Patient B.W.  The respective diagnoses were primary osteoarthritis for his ankles and heel, intervertebral disc degeneration for his back, primary osteoarthritis for his knees, and Rheumatoid arthritis for his wrists.  DME

suppliers submitted claims for these braces between September 18, 2019 and September 25, 2019, in the amount of $6,238.34, one day after EA0393D3DBEB40FCBCDA0FAAFD04C0BB was electronically signed using IP1. Medicare paid $3,948.16 on these claims.

52.     B.W. was interviewed by FBI and HHS-OIG on February 8, 2022. B.W. received a phone call saying he was eligible for free braces from Medicare. B.W. told the caller he could use ankle braces and a back brace but did not mention knee or wrist issues. Soon after the call, B.W. received a box of braces. B.W. tried the wrist and back braces, but they did not help. He denies knowing Singh or having a consultation with her.

53.     Medicare records show Singh ordered Patient B.G. an L0648 back brace based on a diagnosis of other intervertebral disc degeneration. A DME supplier submitted a claim for $1407.08 on December 30, 2019, based on this order, about 32 days after B9B552DF3950476883763B9EAE8F880E was signed using IP address 47.31.77.234 ("IP2"). Medicare paid $799.10 for the claim. The Envelope was signed on November 28, 2019, while Singh was outside the United States according to the DHS.

54.     On February 3, 2021, B.G. was interviewed by HHS-OIG and FBI. B.G. received many phone calls soliciting DME. The callers seemed to have foreign accents and were hard to understand but were smooth talkers. One caller she remembers asked if she had any pain in her body after telling her she was eligible for free braces from Medicare. B.G. said her knees hurt and maybe she could use some knee braces. B.G. received one back brace, size small. She never wanted the brace, and it was also at least one size too small for her. B.G. tried to return the brace several times by calling the company and asking for a return label. The person that answered the phone told her she would receive a label in the mail to return the brace. B.G. never received the label expressed frustration at the whole process of receiving a back brace instead of

knee braces. She also didn't understand why they would send her a back brace and not knee braces. B.G. did not receive a consultation from a medical provider regarding the back brace before it was shipped. B.G. does not have any female doctors and has never heard of the name Ankita Singh.

55. Medicare records showed that Singh was the referring provider two L1851 knee braces, two L2397 suspension sleeves, and one L0650 back brace for Patient R.I. The diagnoses were bilateral osteoarthritis for her knees and other intervertebral disc degeneration for her back. A DME supplier submitted claims to Medicare for $3,402.74 on October 1, 2019, eight days after 3BFF213C478F4C9FB736B2198F80DFDA was signed using IP1. Medicare paid $2,549.24 for the claims.

56. R.I. was interviewed by FBI and HHS-OIG on October 18, 2021. R.I. received a phone call from someone offering free orthotic braces in the mail. She told the caller she did not want or need any braces. R.I. received several braces a short time after, but never used them. R.I. has not been diagnosed with any back or knee issues. R.I. does not know the name Ankita Singh and denied having a consultation with Singh.

57. Medicare records showed Singh was the referring provider for two L1851 knee braces), two L2397 suspension sleeves, one L0648 back brace, one L1906 ankle brace, and one L3170 heel stabilizer for Patient A.H. The diagnoses were bilateral osteoarthritis for his knees, osteoarthritis for his ankle and heel, and disc degeneration for his back. A DME supplier submitted claims to Medicare on November 18, 2019, for $4,055.00 for these braces, only five days after 4B3EECEEE1E64B21BDAF4995C6753EF4 was signed using IP1. Medicare paid $2,513.15.

58. A.H. was interviewed by FBI and HHS-OIG on October 19, 2021. A.H. received

a phone call from someone offering free braces through Medicare.  A.H. told the caller multiple times he did not need braces and hung up.  The caller attempted calling back several times in a row until A.H. eventually changed his phone number.  A.H. received a box of braces shortly after the call. A.H. never used the braces. A.H. said he did not have any reason to need braces and that he feels good. A.H. denies knowing Singh or having a consultation with Singh. A.H. was never diagnosed with osteoarthritis in his knees or ankles or disc degeneration in his back.

59.     578 of the Envelopes contain the name "S.R." as well as the email [S.R.] marketing@gmail.com within the consumer disclosure. 461 of the Envelopes contain [EMMG] @gmail.com as the Envelope sender. S.R. and EMMG are subjects of the same investigation in another jurisdiction as BA.  S.R. was known to operate a marketing and telemedicine business where he illegally sold pre-packaged doctor orders to DME suppliers.

60.     On February 11, 2019, an Envelope with the subject line "Singh, [RTP] App.pdf" was sent by L.P. at lmarotta@[BA].com.  The Envelope was signed on February 11, 2019.

61.     On February 9, 2019, an Envelope with the subject line "Please Fill out and Sign your [BA] Electronic Payment Authorization" was sent by D.R., using [D.R.] @[BA].com.  The envelope was signed on February 27, 2019.

62.     On April 15, 2019, an Envelope with the subject line "Please DocuSign: Revised April SCA from Mobile Family Practice (1).docx" was sent by D.R., using [D.R.] @[BA].com. The envelope was signed on April 16, 2019. Your Affiant knows it is common for SCA to stand for Standard Care Agreement.

63.     On July 8, 2019, an Envelope with the subject line "Please DocuSign: [BA] Time Sheet - Printable PDF.pdf" was sent by D.R., using [D.R] @[BA].com.  The envelope was signed on the same day.

64.     On October 26, 2020, an Envelope with the subject line "Please DocuSign: [BA] Provider EFT Enrollment Form - Ankita Singh" was sent by D.R., using drussell@bartonassociates.com.  The envelope was signed on the same day.

65.     A cooperating witness ("CW") from another jurisdiction was interviewed in April 2021 concerning his connection with DME suppliers, marketers, and telemedicine providers as it relates to similar DME fraud investigations.  CW was the owner of several of the top DME suppliers who submitted claims to Medicare where Singh was the ordering/referring provider. CW purchased patient information from marketing suppliers, to include S.R. CW then provided patient details to S.R. to obtain a signed doctor order.  CW paid S.R. $100 per signed order.  The invoices were disguised as marketing and consulting hours.  CW had suspicions that a large amount of these beneficiaries was never contacted by the medical provider.  The suspicion came to be after CW's DME companies received complaint calls from beneficiaries saying that they never spoke with a doctor and braces just showed up, etc. CW said to some extent it was able to be overlooked because perhaps the patient forgot about the consultation.  However, after thinking about it more, there were so many orders that there could not have been a way that all the patients were being contacted by doctors based on the turnaround, which was about two to three days or less.  The conversion rate was also troubling.  If CW sent an order to S.R. to be signed, everything came back with a doctor's signature, and nothing was denied.  CW does not believe this made sense because people change their mind, or providers will decide that the beneficiary does not need a brace that is being requested, etc. Regardless of this fact, virtually every order CW sent to S.R. was signed with no changes. CW also had conversations with S.R. concerning switching billing codes from one type of knee brace to another due to medical insurance rejection rates. S.R. never pushed back on CW. S.R. actually told CW to just change

the codes on the doctor orders at times. CW also thought it was a "red flag" that he did not pay the telehealth company directly, instead paying one of S.R.'s companies.

66. Finally, in April 2021, agents received a complaint from the OIG-Hotline in which a Medicare beneficiary had received two leg braces that Singh ordered. The complainant was the beneficiary's mother. The complainant did not recognize Singh's name. The package was sent by Reliable DME. Reliable DME is known to be the subject of multiple other OIG-hotline reports and was under investigation in another jurisdiction.

67. By becoming a participating provider in Medicare, Singh agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. This included reviewing/maintaining medical records regarding the treatment of the beneficiary, to include "records documenting actual treatment of the patients," and "…must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the result in the management of the beneficiary's specific medical problem." As the 35 beneficiaries interviewed had no knowledge of Singh, or ever spoken to any medical provider regarding needing DME that Singh ordered, it is unlikely Singh provided any treatment to the patient. Additionally, as noted above, a review of Medicare claims data indicated Singh did not bill for any professional services rendered to any Medicare beneficiaries for whom she has ordered either DME for 99.7% of the beneficiaries. Section 1848(g)(4)(A) of the Social Security Act requires that a physician submit claims for all their Medicare patients for services rendered. This requirement applies to all physicians and suppliers who provide covered services to Medicare beneficiaries. Therefore, the Medicare claims Singh caused by signing the "referrals," or orders, for DME should not have been reimbursed by Medicare. Singh caused the fraudulent billing to

occur by signing the referral for either DME despite never establishing a doctor-patient relationship with the beneficiary or providing them with any form of medical care.

## USE OF COMPUTER AND PHONE

68.     On December 24, 2020, AT&T responded to a subpoena request for subscriber records related to IP1. IP1 was assigned to an account for AT&T U-Verse ("U-Verse"). According to AT&T's website, U-verse is now called AT&T Internet.  In other words, U-Verse is an internet service provider. A.A., Singh's husband, was listed as the account owner.  The address on the account was 3428 Swan Ridge Ln, Monclova Township, Ohio.  The phone number associated with the account was xxx-xxx-0064.

69.     On February 1, 2021, a Federal Grand Jury subpoena was served on AT&T for records associated with A.A.'s identified phone number.  On February 3, 2021, AT&T returned a response confirming A.A. was the subscriber for telephone number.  The phone number with the most inbound and outbound calls was xxx-xxx-7445.

70.     On June 1, 2021, a Federal Grand Jury subpoena was served on AT&T for records associated with xxx-xxx-7445.  On June 5, 2021, AT&T returned a response that payment records associated with this account showed credit cards payments made by A.A. AT&T listed the subscriber user information as Ankita Singh with address 3428 Swan Ridge Ln, Maumee, OH.  The email address for the user information was dr.ankitasingh@gmail.com.  Records showed that as of May 25, 2020, the type of phone was an Apple iPhone 8 Plus. Records showed no phone calls between Singh's cellular phone number, xxx-xxx-7445 and any of the known phone numbers for the 35 beneficiaries interviewed.

71.     On March 29, 2021, a Federal Grand Jury Subpoena was served on Apple, Inc for records associated with xxx-xxx-0064 and xxx-xxx-7445. On April 7, 2021, Apple responded to

this request. As of December 4, 2020, records showed that Singh registered an iPhone 12 Pro Silver using AT&T with Apple. Singh's apple logon id ("Apple ID") is listed as dr.ankitasingh@gmail.com. Singh made transactions with Apple Media Services using IP1 more than 2,600 times during the approximate three (3) year time period of the subpoena request. The earliest interaction using IP1 was January 5, 2018, and the latest was February 21, 2021. The date range for the subpoena was January 1, 2018, until the date served.

72.     Apple's account recovery, iForgot, is a process designed to get a user back into their Apple ID account when a user does not have enough information to do a regular password lookup. Singh used this process 31 times during the period of the subpoena. Eighteen (18) of these requests were initiated from a device using IP1. The earliest request in the subpoena was on April 4, 2020, and the latest was on December 23, 2020.

73.     Apple maintains an Integrated Database Management System ("IDMS"). IDMS is the system Apple uses to authenticate users Apple ID logins for various services provided by Apple. Apple captured 399 authentications for Singh's Apple ID from IP1 between October 8, 2019 and March 22, 2021.

74.     An open records search for general information related to IP2 showed that it is currently under the control of Reliance Jio Infocomm Limited ("Reliance"). According to Bloomberg, Reliance provides wireless telecom products and services in India. Reliance offers voice, data, and messaging services, as well as sells smart phones and hotspot devices. Jio Infocomm serves customers in India. The approximate location of IP2 is near New Delhi, India.

### RECENT RELOCATION

75.     According to records provided by The Toledo Clinic pursuant to the aforementioned Federal Grand Jury subpoena, Singh submitted a resignation letter to The Toledo

Clinic on June 30, 2021.  The letter in part read "…I am writing this letter as a follow up to the email that I sent on June 15, 2021, wherein I had conveyed my plans to relocate to Phoenix, AZ due to family reasons…If needed I can provide limited coverage past July 15th thru July end because I will be traveling back and forth due to my pending move..."

76.     Drug Enforcement Administration records showed that on December 1, 2021, Singh updated her Controlled Substances registration with an address of 1955 West Frye Rd Chandler, AZ. Singh renewed her registration on January 19, 2022, with the same address. 1955 West Frye Rd. Chandler, AZ is the address of Chandler Regional Medical Center.

77.     Lucas County, OH real property records showed that 3428 Swan Ridge Ln, Maumee, OH was sold on January 13, 2022.  The selling parties were A.A. and Ankita Singh. Previous records showed that A.A. and Singh purchased the home on December 15, 2015.

78.     An open-source record check conducted on March 22, 2022, showed a possible address of 2797 E Teakwood Pl Chandler, AZ for Singh and her husband.  Records also showed that the property was listed for rent off-and-on beginning March 12, 2018.  The rental listing was removed on July 2, 2021.

79.     Maricopa County records showed that 2797 East Teakwood Place, Chandler, AZ is owned by R.C.  The records also showed that it is a property that is rented or for rent.

80.     Arizona state records showed that Singh obtained Driver's License number X6xxxxxxx issued on February 22, 2022, with expiration of August 30, 2024, and an address of 2797 East Teakwood Place, Chandler, AZ.  Arizona state records showed that A.A. obtained Driver's License number S1xxxxxxx issued on January 14, 2022, with the same address.

81.     Arizona Corporation filings show that "D.H.W." PLLC (DHW) is a Domestic Professional LLC in Maricopa County.  The corporate agent's name is A.A. and the business was

listed as active. DHW was formed on June 21, 2021. The most recent filing on September 3, 2021, showed a DHW address of 4135 S. Power Rd. Suite 101, Mesa, AZ 85212. This address is approximately 13 miles from the 2797 East Teakwood Place address. Ohio Secretary of State records showed that two (2) of three (3) of A.A.'s businesses in which he was the sole statutory agent filed dissolution paperwork on January 1, 2022. The businesses were Karamyogi, LLC and Anandniketan, LLC.

82. Open source records show a business named Arizona Dental Heights with A.A. as the primary dentist at 4135 S Power Rd Suite 101, Mesa, AZ. The business appears to maintain a website showing a photo of A.A. and listing his name.[9]

83. "D-Health" is made up of more than 60,000 caregivers and staff who deliver care in 21 states. Headquartered in San Francisco, D-Health is the fifth largest health system in the nation and the largest hospital provider in California. D-Health's website showed Singh affiliated with "P-Health" with a specialty of Family Medicine. Her office location was listed as 3115 S Price Rd. Chandler, AZ. This address is approximately eight (8) miles from the 2797 E Teakwood Pl address. The website also shows that Singh is affiliated with Chandler RMC/MGMC.

84. Updated Medicare enrollment records showed that on April 1, 2021, Singh reassigned her benefits to P-Health. Singh submitted her correspondence address as 3115 S Price Rd Chandler, AZ. Singh listed the primary address of P-Health as 3555 S Val Vista Dr Gilbert, AZ 85297. Gilbert, AZ is located approximately seven (7) miles from Chandler, AZ.

85. According to State of OH records, A.A. had three (3) vehicles registered to him at 3428 Swan Ridge Ln Maumee, OH. The vehicles were a 2009 Blue BMW with license plate

---

[9] https://azdentalheights.com/meet-our-team

FYB8220, a 2010 Black Mercedes with license plate GFK5758, and a 2017 Gray Tesla with license plate HPG5219. All three (3) vehicles showed active registrations in OH as of March 21, 2022. Singh did not have any vehicles registered to her in OH or AZ.

86. According to AZ state records, A.A. has two vehicles with current registrations in AZ. He registered a light blue 2009 BMW 335 convertible with AZ license plate 76A2DF and a gray 2017 Tesla Model S with license plate 7PA7DF. Both are registered with the address of 2797 E Teakwood Pl Chandler, AZ.

87. On April 13, 2022, HHS/OIG/OI agents conducted surveillance at 2797 E Teakwood Pl Chandler, AZ. Agents observed a female enter the residence at approximately 1900 hours local time and then exit after approximately 80 minutes. Agents spoke with the female shortly after she departed the residence and identified her as B.A., a Notary Public. B.A. stated she was visiting the residence in order to notarize documents for Ankita Singh. Agents showed B.A. a photo of Singh and B.A. identified it as the photo she had just seen inside the residence on Singh's AZ Driver's License. B.A. identified Singh in the residence and as the one that signed the documents. Agents also observed a Blue BMW convertible with AZ plate 76A2DF and a Gray Tesla Model S with unobservable license plate both parked in the garage. Both registrations expire on January 15, 2023.

88. Based on my training and experience, I believe the foregoing demonstrates that Singh and her husband have relocated to the Chandler, AZ area and currently reside at 2797 E Teakwood Pl. Chandler, AZ.

## BANK AND EMPLOYMENT RECORDS

89. A review of bank accounts associated with Singh showed payments in the form of direct deposits from BA from March 8, 2019, to August 14, 2020. These payments would

potentially be considered kickbacks in the form of consultation fees because Singh willingly signed the fraudulent DMEPOS orders using DocuSign knowing that the orders were false or fraudulent. She knew they were false or fraudulent because Singh had no legitimate doctor-patient relationship with the Medicare beneficiaries according to the beneficiary interviews and electronic evidence presented in this affidavit.  The payments were made approximately weekly or bi-weekly.  They totaled $71,296.00.

90.     On March 9, 2022, a Federal grand jury subpoena issued to BA was served. On April 1, 2022, BA responded to the subpoena with multiple electronic files. One document was an agreement for Singh to provide consultations in exchange for $15 per assessment. Your affiant believes that this consultation rate is below market rates for a physician and may have been used as a way to induce Singh to sign orders for DMEPOS, a violation of the anti-kickback statute.

91.     As part of the BA production, an application signed by Singh on February 11, 2019 for RTP was reviewed. Some items listed in the applications were an email address of dr.ankitasingh@gmail.com, NPI number of 1265870935, DEA license number of FS6059174, duplicate home and mobile phone numbers of xxx-xxx-7445, home address of 3428 Swan Ridge Ln Maumee, OH, and office address of 5757 Monclova Rd #15 Maumee, OH. Additionally, the document was signed using DocuSign on the same day as the Envelope referenced earlier in this affidavit that used the Subject "Please DocuSign: Singh, [RTP] App.pdf." Your affiant believes this Envelope matches this underlying document because the pre-selected signatures match and the unique signature number for Singh matches the Envelope and Real Time Physician application.

92.     Another document obtained from BA was a Placement Order from BA for the

client, RTP, LLC for Singh to provide Telehealth services. The document states that the Client's patients' location for the Telehealth Services would be Telemed, OH 43001. The order was for June 18, 2019, through September 18, 2019. During this time, telehealth rules from Medicare had not yet been relaxed due to COVID-19 pandemic declaration so patients would have been required to be at a medical facility with access to video and audio conferencing capabilities. Zip code 43001 relates to Alexandria, OH. Agents spoke with at least six (6) Medicare beneficiaries that Singh signed orders for DMEPOS using DocuSign during the period of this agreement. None of the beneficiaries reported having any type of conversation with Singh. These beneficiaries lived an average of approximately 128 miles from Alexandria, OH. Your affiant believes it is not reasonable for someone in Ohio to travel 128 miles to obtain a doctor's order for DMEPOS items.

93.     Additionally, the rate per assessment for the RTP, LLC agreement was $16. Your affiant believes that this consultation rate is below market rates for a physician and may have been used as a way to induce Singh to sign orders for DMEPOS, a violation of the anti-kickback statute.

94.     Based on my training and experience, telemedicine providers routinely use technology to communicate with the telemedicine companies they are employed by and conduct business remotely, often from their homes. Emails can include things like payment contracts, instructions on accessing patient information for review, instructions on proper coding and billing procedures, and how to correctly handle referrals and orders. Telemedicine companies often use online "portals" so providers can access records and review/sign referral orders for services, such as DME, genetic testing, and prescription drugs. These portals can be accessed from any computer with an internet connection, making working from home possible.

95.     Singh caused high Medicare billing for prosthetic/Orthotic durable medical equipment prosthetics, orthotics, and supplies ("DMEPOS") referrals/prescriptions, amounting to over $8,448,115.91 million between June 4, 2018 and May 24, 2021. During the same timeframe that Singh was signing off on the DMEPOS referrals referenced in paragraph 6, bank records showed that Singh earned $280,682.30 from employment at The Toledo Clinic and Wellcare Physicians. BA paid Singh $71,296 during the same timeframe.

### Conclusion

67.     Based upon the foregoing, I respectfully submit that there is probable cause to believe Dr. Ankita Singh violated 18 U.S.C. §§ 1347, 1349 and Title 42 U.S.C. §§ 1320a-7b.

Respectfully submitted,

Bradley Fearn
Special Agent
U.S. Dept. of Health and Human Services
Office of Inspector General
Office of Investigations


Sworn to via telephone on this 15th day of April, 2022 after
submission by reliable electronic means.
Fed.R.Crim.P. 4.1 and 41(d)(3).


DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE
Northern District of Ohio

Darrell A. Clay
United States Magistrate Judge