FILED

MAY 10 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | INDICTMENT |
| Plaintiff, ) | JUDGE ZOUHARY |
| ) | |
| v. ) | CASE NO. 3:22 CR 228 |
| ) | Title 18, United States Code, |
| ANKITA SINGH, ) | Sections 1347 and 2 |
| Defendant. ) | |

General Allegations

At all times material to this Indictment:

1. Defendant ANKITA SINGH was a physician licensed by the State of Ohio Medical Board and a resident of Maumee, Ohio.

2. Defendant's medical practice was a primary care and family practice, and she worked at doctor's offices and hospitals located in Maumee and Toledo, Ohio.

Medicare Program

3. The Medicare Program ("Medicare") was a federal health care benefit program as defined by Title 18, United States Code, Section 24(b), that provided benefits to persons who are at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

4. Medicare had multiple parts. Medicare Part B covered, among other things, costs relating to Durable Medical Equipment Prosthetics/Orthotics, and Supplies ("DMEPOS").

ORIGINAL

Generally, Medicare Part B covered DMEPOS costs only if, among other requirements, they were medically necessary, ordered by a physician or non-physician practitioner, and not induced by a financial payment to either the physician or patient.

5. DMEPOS generally referred to equipment that provided a therapeutic benefit or enabled a patient to perform tasks that he or she was unable to otherwise undertake. Examples of DMEPOS included back braces, knee braces, shoulder braces, and wrist braces.

6. Before a DMEPOS supplier was authorized to submit claims to Medicare for providing beneficiaries with DMEPOS, two requirements, among others, had to be met. First, those items had to be ordered by a licensed medical provider who had a bona fide physician-patient relationship with the Medicare beneficiary. Second, those items had to be medically necessary. In addition, Medicare would not pay a claim procured through a kickback or bribe, and it would not pay claims that otherwise violated the Anti-Kickback Statute, 42 United States Code Section 1320a-7b, which made it illegal to, among other things, knowingly and willfully offer, pay, solicit, or receive any remuneration in exchange for the referral of any item or service payable under a Federal health benefit program.

7. A DMEPOS supplier that enrolled in the Medicare program was not eligible to receive payment for the provision of DMEPOS to Medicare beneficiaries unless it certified that it understood the civil and criminal penalties for false statements in any application for any payment under a federal health care program. This certification was made at the time of enrollment.

8. A medical provider who enrolled in the Medicare program, including, a physician such as Defendant, was not eligible to receive payment for providing services to Medicare beneficiaries and was not eligible to order medical supplies such as DMEPOS unless the

provider certified his or her understanding of the civil and criminal penalties for false statements in any application for any payment under a federal health care program. This certification was made at the time of enrollment. Defendant first made this certification on or about August 26, 2016.

9. In addition, on or about August 26, 2016, in accordance with Medicare provider requirements, Defendant certified to Medicare that she would comply with all Medicare rules and regulations, and federal laws, including that she would not knowingly present or cause to be presented a false and fraudulent claim for payment to Medicare and that she would comply with the Anti-Kickback statute.

## Purported Patients

10. G.B., A.H., T.S., and C.T. were Medicare beneficiaries who resided in the Northern District of Ohio when SINGH signed orders for DMEPOS purportedly for their benefit.

## Telemedicine

11. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology to interact with a patient.

12. Telemedicine companies hired physicians, including Defendant, to furnish telemedicine services to individuals.

13. In addition to her in-person medical practice at medical offices and hospitals in Maumee and Toledo Ohio, Defendant had a locum tenens contract, under which she purportedly worked as an independent contractor, for at least three telemedicine companies. The telemedicine companies paid Defendant a fee, purportedly to conduct consultations with patients.

14. Until on or about March 1, 2020, Medicare Part B only covered expenses for specific telemedicine services if certain requirements were met, including, among others, that (1) the beneficiary was located in a rural or health professional shortage area; (2) the medical

services were delivered via a two-way, real-time interactive audio and video telecommunications system; and (3) the beneficiary was at a physician's office or a specified medical facility during the telemedicine consultation.

15. After March 1, 2020, due to the public health emergency of COVID-19, Medicare relaxed some of the rules for telemedicine but continued to require that medical services be delivered via a two-way, real-time interactive audio or video telecommunication between a beneficiary and a health care provider.

## The Scheme to Defraud

16. From in or around June 2018, and continuing through in or around May 2021, in the Northern District of Ohio, Western Division, Defendant and others devised and intended to devise a scheme and artifice to defraud and obtain money and property from Medicare by means of false and fraudulent pretenses, representations, and promises, which money and property was used to enrich Defendant and others.

17. It was part of the scheme to defraud that at various times:

    a. The telemedicine companies and DMEPOS suppliers working with these telemedicine companies used telemarketers or call centers to contact Medicare beneficiaries who were not previously patients of Defendant's or other doctors or medical providers with whom Defendant practiced. Call center operators making these "cold calls" attempted to induce such Medicare beneficiaries to agree to receive DMEPOS, specifically braces, in the mail. Call center operators often told the Medicare beneficiaries that the braces would be provided at no cost and that a doctor would contact them.

4

b. The telemedicine, telemarketer, and DMEPOS suppliers used general information about the Medicare beneficiaries to prepare DMEPOS order forms with a beneficiary's name and Medicare number. These DMEPOS order forms also included a purported diagnosis and assessment to support one or more DMEPOS braces, certifying that the DMEPOS was medically necessary for the identified Medicare beneficiary.

c. Defendant received these DMEPOS orders from the telemedicine companies containing a beneficiary's name, Medicare identifier and pre-filled diagnostic, assessment, and test information through online order portals and electronic signature services from these telemedicine companies.

d. Defendant signed these DMEPOS orders electronically, using either an online document signature service or an online portal. She signed these orders even though she never spoke to, examined, treated, or otherwise established a doctor-patient relationship with the Medicare beneficiary listed on the DMEPOS order form.

e. On the DMEPOS orders that she signed, Defendant certified that she was treating the Medicare beneficiary identified in the order, had diagnosed the Medicare beneficiary with the identified medical condition, had performed a physical examination and other diagnostic testing, and that the prescribed DMEPOS brace was medically necessary. The orders also stated that she had discussions with the identified Medicare beneficiaries. In truth and in fact, Defendant knew that she was not treating the

        identified Medicare beneficiary, had neither examined nor assessed the beneficiary, had not performed or ordered diagnostic testing for the beneficiary, had not spoken with the beneficiary, and had not otherwise established a doctor-patient relationship with the beneficiary that would permit her to assess the medical necessity of the device prescribed. Defendant further knew, in truth and in fact, that these beneficiaries did not have an established doctor-patient relationship with another physician with whom Defendant practiced.

f. Defendant caused the DMEPOS orders that she certified, as the prescribing doctor, to be sent to a DMEPOS supplier who shipped the DMEPOS item listed on the order to the identified Medicare beneficiary and submitted a corresponding claim to Medicare.

g. Defendant received payments of approximately $15-$20 from the telemedicine companies for each DMEPOS order that she signed in this manner.

h. Defendant submitted and caused to be submitted false and fraudulent claims to Medicare in an amount in excess of $8 million for DMEPOS devices, including orthotic braces, that were determined to be medically unnecessary, that were procured through the payment of a fee for her signature and not legitimate medical services, and that were ineligible for Medicare reimbursement.

<u>COUNTS 1 through 6</u>
(Health Care Fraud, 18 U.S.C. §§ 1347 and 2)

The Grand Jury charges:

18. The factual allegations of paragraphs 1 through 17 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

19. From in or around June 2018, and continuing until in or around May 2021, in the Northern District of Ohio, Western Division, and elsewhere, Defendant ANKITA SINGH did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, and did knowingly and willfully aid and abet the same.

20. It was part of the scheme and artifice to defraud that: The factual allegations of paragraphs 10 through 17 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

21. On or about the dates listed below, for the purpose of executing and attempting to execute the foregoing scheme and artifice to defraud, and to aid and abet the same, Defendant submitted and caused to be submitted false and fraudulent claims to Medicare, as set forth in the table below, on or about the dates listed below and for the Medicare beneficiaries listed below, each transmission constituting a separate count:

7

| COUNT | DMEPOS ORDER DATE | CLAIM DATE | MEDICARE BENEFICIARY | DMEPOS ITEM ORDERED | TOTAL CLAIM AMOUNT |
|---|---|---|---|---|---|
| 1 | July 16, 2019 | July 17, 2019 | G.B. | L3960 Shoulder Brace; L3916 Wrist Brace | $1520 |
| 2 | October 31, 2019 | November 5, 2019 | C.T. | Two L3916 Wrist Braces L0648 Back Brace | $2150 |
| 3 | November 13, 2019 | November 18, 2019 | A.H. | Two L1851 Knee Braces; Two L2397 Suspension Sleeves; L1906 Ankle Brace; | $2895 |
| 4 | November 13, 2019 | November 18, 2019 | A.H. | L0648 Back Brace; L3170 Heel Stabilizer | $1160 |
| 5 | April 14, 2020 | April 15, 2020 | T.S. | Two L1851 Knee Braces L2397 Left Suspension Sleeve L3916 Left Wrist Brace L0650 Back Brace | $4500 |
| 6 | April 14, 2020 | April 15, 2020 | T.S. | L3916 Right Wrist Brace L2397 Right Suspension Sleeve | $650 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## FORFEITURE

The Grand Jury further charges:

22. For the purpose of alleging forfeiture pursuant to Title 18 United States Code, Section 981(a)(1)(C), Title 18 United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2461(c), the allegations of Counts 1 through 4 are incorporated herein by reference. As a result of the foregoing offenses, Defendant ANKITA SINGH, shall forfeit to the United States any property, real or personal, which constitutes or is derived from the proceeds traceable to the violations charged in Count 1; and any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violations charged in

Counts 1 through 4; including, but not limited to, a money judgment in the amounts of the proceeds traceable to the violations charged in Counts 1 through 4.

## SUBSTITUTE ASSETS

23. If, as a result of any act or omission of Defendant, any property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person:

    c. has been placed beyond jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been comingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of Defendants up to the value of the forfeitable property described above.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.