UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA      )
                                    )
      v.                         )         **CASE NO: 3:22-cr-00228-JZ-1**
                                    )

**ANKITA SINGH**                   )

## DR. SINGH'S POSITION REGARDING THE 11(C)(1)(C) PLEA AGREEMENT

Defendant Ankita Singh, through undersigned counsel, submits this memorandum to explain why the Court should accept the proposed plea agreement under Rule 11(c)(1)(C).[1] The government made multiple significant errors in its investigation and prosecution of Dr. Singh, and it faced substantial risk that it could not prove the charges beyond a reasonable doubt. Dr. Singh, meanwhile, faced serious risk of deportation if convicted of even a single felony count. Although Dr. Singh maintains that the government should have dismissed the charges in favor of the civil resolution she offered years ago, both parties made concessions that produced the plea agreement now before the Court.[2]

## I.      Background

Beginning in 2015, doctors and nurse practitioners across the country began ordering large volumes of prosthetics and orthotics that cost Medicare millions of dollars. Before 2014, no doctor or nurse practitioner had ordered more than $1 million of prosthetics and orthotics in a single year. Suddenly, many doctors were doing so – including those in specialties where such large orders

---

[1] In deciding whether to accept or reject a plea agreement under Rule 11(c)(1)(C), a district court must exercise "sound judicial discretion" and "must rationally construct a decision based on all relevant factors." *United States v. Cota-Luna*, 891 F.3d 639, 647-48 (6th Cir. 2018) (internal citations and quotations omitted).

[2] This memorandum addresses the government's mistakes of law. A separate memorandum, filed under seal, addresses an aspect of the plea negotiations that also explains why the government agreed to significant concessions.

1

would be unusual. Between 2015 and 2020, hundreds of medical professionals each ordered more than $1 million in prosthetics and orthotics, collectively costing Medicare more than $1.3 billion.

Criminal actors such as Steven Richardson and Marc Sporn drove much of this activity. Richardson pleaded guilty in the District of Massachusetts to conspiracy to commit health care fraud. Sporn pleaded guilty in the Southern District of Florida to conspiracy to commit health care fraud and wire fraud, as well as tax evasion. *See United States v. Richardson*, No. 1:24-cr-10045-NMG (D. Mass.), ECF No. 4; *United States v. Sporn*, No. 9:22-cr-80007-DMM (S.D. Fla.), ECF No. 16. Sporn "operated a call center that ran telemarketing campaigns designed to convince Medicare beneficiaries to agree to take" genetic tests. Sporn, ECF No. 16 at 6. Richardson hired telemarketers to conduct "telemarketing campaigns during which marketers contacted Medicare beneficiaries and induced them to accept DME." Richardson, ECF No. 4 at 11. Medicare regulations generally forbid the use of telemarketing to call patients regarding durable medical equipment. *See* 42 C.F.R. § 424.57(c)(11).

In his plea, Richardson acknowledged hiring dozens of medical practitioners to review and sign orders generated by the marketers. Richardson, ECF No. 4 at 11. According to the plea agreement, these doctors "often authorized the medical items and services without even speaking with the beneficiaries," and some authorized items "without even reading the orders and records they signed." *Id*.

Sporn's and Richardson's criminal conduct began well before the charges in this case. Richardson admitted conspiring beginning in or around March 2016. Richardson, ECF No. 4 at 10. Sporn admitted conspiring beginning in or around January 2017. Sporn, ECF No. 16 at 5.

By 2018, the federal government was aware of these problems. In August 2018, Medicare contractors published a video discussing these issues.[3] A Medicare medical director warned doctors "considering telemedicine contracting arrangements" to "enter into these agreements with care" and advised that "engagement of an attorney knowledgeable in healthcare matters may be warranted before entering into telemedicine arrangements."

On April 9, 2019, the federal government announced charges relating to "one of the largest health care fraud schemes involving telemedicine and durable medical equipment marketing executives"-a coordinated action called Operation Brace Yourself. Many doctors who had ordered large quantities of braces in the preceding years stopped doing so.

Around the same time, Dr. Singh-who had not heard about Operation Brace Yourself and was not informed of it by her contacts at the locum tenens company she was working with-began working for Real Time Physicians (around February 2019) and Expansion Media (around April 2019). She performed chart reviews for these companies intermittently until May 2021.

On April 15, 2022, a special agent with the U.S. Department of Health and Human Services swore out an affidavit in support of a criminal complaint alleging that Dr. Singh committed health care fraud in violation of 18 U.S.C. § 1347, conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, and violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. ECF No. 1.

Agents arrested Dr. Singh at her home in Arizona on April 20, 2022. She was released on bond, and a preliminary hearing was set for May 10, 2022. ECF No. 4 at 2.

On May 10, 2022, shortly before the preliminary hearing, a grand jury returned an indictment. The indictment alleged six counts of health care fraud in violation of 18 U.S.C. § 1347,

---

[3]     A transcript of the video is available at https://www.cgsmedicare.com/jb/education/video/mm/MM_MD_Telehealth_2018.pdf

3

all relating to a scheme that Dr. Singh allegedly "devised and intended to devise" with others. The scheme allegedly began in June 2018 – before she even worked for Real Time Physicians or Expansion Media – and allegedly continued until May 2021. The grand jury did not charge conspiracy to commit health care fraud or violations of the Anti-Kickback Statute.

Trial began on February 23, 2024. The government presented thirteen witnesses in its case-in-chief over four days. Dr. Singh did not present a defense case. On February 29, 2024, the jury returned a verdict of guilty on all six counts.

On April 15, 2024, Dr. Singh filed a motion for acquittal or new trial. ECF No. 75. This Court denied the motion on May 16, 2024. ECF No. 78.

On July 18, 2024, this Court sentenced Dr. Singh to 26 months' imprisonment, two years' supervised release, restitution of $4,470,931.02, and a $600 special assessment. ECF No. 104. The government had requested a sentence of 70 to 87 months. ECF No. 94 at 5.

Dr. Singh appealed. On August 8, 2025, the Sixth Circuit reversed the conviction and remanded for further proceedings. *United States v. Singh*, 147 F.4th 652 (6th Cir. 2025). The Sixth Circuit found that this Court abused its discretion in excluding Dr. Singh's statements to an Optum investigator. *Id*. at 660-61. The Sixth Circuit also found that this Court abused its discretion in allowing the government to present lay testimony to prove that Dr. Singh's orders were per se not medically necessary if she had not examined the patients herself. *Id*. at 662-63. Finally, the Sixth Circuit held that the jury instruction on "willfully" was incorrect: "[I]f there is any retrial, the jury instructions for a violation of 18 U.S.C. § 1347 must specify that the government is required to prove beyond a reasonable doubt that Singh acted with knowledge that her conduct was unlawful." *Id*. at 659-60.

Shortly after the mandate issued, on September 30, 2025, the government informed undersigned counsel that it intended to supersede the indictment and add false-statement charges under 18 U.S.C. § 1035.

Dr. Singh requested to testify before the grand jury considering the superseding indictment. She testified for approximately three hours on November 20, 2025. Among other things, Dr. Singh testified about her understanding of the physician-patient relationship-specifically, that she believed she had a valid physician-patient relationship when she reviewed a patient's chart and made a medical decision based on that review.

On December 17, 2025, a grand jury returned a superseding indictment charging Dr. Singh with fourteen counts of health care fraud, six counts of false statements regarding health care matters, one count of money laundering, and one count of wrongful disclosure of personal health information. The indictment includes several references to whether Dr. Singh was "treating" the patient. *See* Superseding Indictment at 8 ("SINGH falsely certified that she was treating the Medicare beneficiary identified in the order") and 11 (alleging false statements that patients are "being treated by me" and that Dr. Singh had established a "valid prescriber-patient relationship").

On February 2, 2026, Dr. Singh and the government presented a plea agreement to this Court under Rule 11(c)(1)(C). If accepted, the agreed-upon sentence will consist of four months' imprisonment, one year of supervised release, no fine, and restitution of $400,000. ECF No. 135. After conducting a plea colloquy, the Court reserved acceptance of the plea agreement.

On March 10, 2026, the Court held a hearing and expressed that it was "troubled" by the plea and was "struggling" with the conclusion the parties reached. The government stated that it agreed to the plea for judicial efficiency, to advance the case, and because Dr. Singh may be able to pay more in restitution if not deported. Undersigned counsel responded that the government was

5

omitting important information, and the Court granted leave for Dr. Singh to submit this memorandum and a separate memorandum filed simultaneously under seal.

## II.     Dr. Singh's Position

The government's investigation appears to have been premised on several fundamental mistakes of law. First, the government initially did not believe it had to prove that Dr. Singh acted with knowledge that her conduct was unlawful – even though the Sixth Circuit had clearly established this requirement. Second, the government believed and apparently still believes that Dr. Singh had to personally examine patients before ordering braces, even though no such requirement existed during the relevant time period. These errors permeated the government's entire case, and they would not have been repeated at retrial. The government therefore faced substantial risk that it could not prove the charges in either the original or superseding indictment.

### A.  The United States initially may not have known that it had to prove that Dr. Singh acted with knowledge that her conduct was illegal

In *Bryan v. United States*, 524 U.S. 184 (1998), the Supreme Court held that to establish a willful violation of a statute, the government must prove that the defendant "acted with knowledge that his conduct was unlawful." Id. at 192. Several circuit courts – including the Sixth Circuit – have applied this holding to health care fraud prosecutions. *See, e.g., United States v. Roth*, 628 F.3d 827, 834 (6th Cir. 2011) ("Generally … in criminal cases, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful"); see *also United States v. Trumbo*, 849 F. App'x 147, 150 (6th Cir. 2021) (noting that the district court correctly "instructed the jury that '[t]he word willfully means that the act was done voluntarily and purposefully with the intent to violate a known legal duty; that is, with the intent to do something the law forbids'").

6

The Sixth Circuit's pattern jury instructions contained – and still contain – a definition of willfully" that was inconsistent with binding precedent and wrong as a matter of law:

> An act is done 'knowingly and willfully' if it is done voluntarily and intentionally, and not because of mistake or some other innocent reason.

When the government initiated this investigation, it apparently proceeded under the mistaken belief that it did not have to prove Dr. Singh acted with knowledge that her conduct was illegal. The affidavit submitted in support of the criminal complaint contains no discussion of Dr. Singh's knowledge, intent, or state of mind. The word "willfully" appears only in the first paragraph, and no facts or evidence establish that Dr. Singh acted with knowledge that her conduct was illegal. The affidavit treated health care fraud, conspiracy to commit health care fraud, and violation of the Anti-Kickback Statute as if the willfulness element did not exist.[4]

The government's error explains a question central to the Court's evaluation of the 11(c)(1)(C) agreement: Why was Dr. Singh charged, imprisoned for ten months, and left facing potential further imprisonment and deportation when hundreds of doctors across the country performed the same type of "chart review" work for Expansion Media, Real Time Physicians, and similar companies without being charged? The answer is not that Dr. Singh engaged in particularly egregious conduct. She is nothing like Sargon Audisho – a medical professional who admitted

---

[4] The affidavit also appears to have been based on a misunderstanding of how DocuSign works, which may have led the government to believe incorrectly that Dr. Singh did not review any patient information before ordering braces. For example, in paragraph 38 of the affidavit, the agent stated that "[h]er signature was drawn on the device and she used a mobile device for all these envelopes" and that Singh "applied a staggering 234 electronic signatures to seven envelopes in the period of only 23 minutes." But this is not how DocuSign works. Dr. Singh reviewed the charts for the key information she needed to make medical decisions, then approved all charts in an envelope at once. Once she approved the envelope, DocuSign added her signature in every place where it was configured to appear. Dr. Singh was able to do this more quickly than a law-enforcement agent might expect, but it should be no surprise that she could do this quickly given that she was a physician making relatively low-complexity decisions based on information she believed to be true.

that he did not even examine the charts he was supposed to review, who had people who were not medical professionals signing his name on charts without any medical review, and who caused far greater losses to Medicare in terms of braces and genetic tests. Nor is it that Dr. Singh did more of this work than other doctors; publicly available Medicare data shows dozens of physicians ordered braces that cost Medicare more. The answer, at least in part, is that the prosecutors and agents who initiated and tried this case – and their supervisors – did not know they had to prove an element of the crime that other prosecutors around the country properly considered when making charging decisions.

Had this case proceeded to a second trial, many of the mistakes that permeated the first trial would not have been repeated, and the government would have struggled to prove that Dr. Singh acted with knowledge that her conduct was illegal. First, as discussed below, ordering braces based on a chart review did not violate any law or Medicare regulation in effect during 2018-2021, so government witnesses would not have testified otherwise. Second, Dr. Singh would have testified in her own defense that she did not believe ordering braces based on chart reviews was unlawful-consistent with her understanding of medical practice. Third, Dr. Singh would have presented evidence corroborating her belief, including the statements to the Optum investigator that were erroneously excluded at the first trial. Fourth, she would have presented evidence that she trusted people and was arguably naïve-particularly because, as a foreign-trained physician, she was less familiar than other doctors with what constitutes criminal conduct under U.S. law, a fact that made her more susceptible to people like Steve Richardson of Expansion Media.

The government thus faced substantial risk that it could not prove an element it had not even considered when initiating this case.

**B. The United States incorrectly believed that a doctor had to personally examine a patient before ordering a brace in the 2018-21 period**

Throughout the first trial, the government improperly argued that a doctor must personally examine a patient before ordering a brace.

- The government argued this in opening statement: "It's common knowledge that before a doctor writes a prescription for their patient, they've examined that patient, talked to them, ask them questions about their symptoms, all in an effort to determine what the patient really needs… Even in this day and age of Telehealth services, you still would expect a doctor to see their patient, either by video, or pick up the phone and speak to them and ask them before ordering or prescribing them medication. You would never expect a doctor to sign off on orders of medical records that contain false information just so that they could order things for their patient that the patient doesn't even need. That's exactly what happened in this case."
- Suzy Hartman from Medicare contractor CoventBridge testified: "Per Medicare guidelines, when a referring physician, or a treating physician, is referring a patient for orthotics, there must be a prior relationship with that patient established prior to that orthotic being ordered. The provider should be evaluating that patient to determine their need and if an orthotic is medically necessary."
- Kristine Whittaker from Optum testified: "There was no prior relationship between Dr. Singh and the members that she was listed as the ordering provider for on those claims … I did not see a provider-member relationship, meaning I did not see that there were office visits given, or billed by [Dr. Singh] before these orthotic braces were dispensed."

As the Sixth Circuit held, lay testimony should not have been allowed on this issue because it "requires specialized knowledge of the professional standards of care for physicians and the established standards for Medicare." *Singh*, 147 F.4th at 662.

But the problem was more fundamental. The government's argument and the lay witness testimony were wrong as a matter of law. Medicare guidelines during 2018-2021 did *not* require a personal examination, nor did *they* require a "prior" relationship between the physician and the patient. Moreover, Dr. Singh could and did form a valid physician-patient relationship under Ohio law when she reviewed patient charts and chose to make medical decisions to treat those patients.

9

### 1.  **Medicare requirements in the 2018-21 period**

The government's case appears to have been based on a fundamental misunderstanding of Medicare requirements. When the complaint against Dr. Singh was authorized in **April 2022**, Medicare did require face-to-face encounters for some of the braces at issue. But that requirement had taken effect only a few months earlier, in **January 2022**.

During the period relevant to this case – 2018 to 2021 – *no* Medicare requirement mandated that a doctor personally examine a patient before ordering the braces at issue. Some of the braces Dr. Singh ordered are *now* subject to face-to-face encounter requirements, but *they were not during* 2018 through 2021. Other braces are still not subject to such requirements and are merely "potentially subject" to them in the future.

When Medicare actually requires a face-to-face encounter or a prior relationship for a prescription, the requirement is stated explicitly in regulations or statutes. For example, 42 C.F.R. § 418.22 establishes a face-to-face encounter requirement for some recertifications of hospice services: a hospice physician must have a face-to-face encounter with "each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period." Similarly, the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 amended 21 U.S.C. § 829 to deem invalid prescriptions of drugs "delivered, distributed, or dispensed by means of the Internet" unless the prescribing practitioner "has conducted at least 1 in-person medical evaluation of the patient" within the preceding twenty-four months.

No similar regulations were in effect for the braces at issue during 2018 to 2021. Regulations *now* require face-to-face encounters for some of these braces, but that requirement took effect only in 2022, when Medicare issued the first iteration of the Required Face-to-Face Encounter and Written Order Prior to Delivery List. See 87 Fed. Reg. 2051.

The table below summarizes the status of the braces Dr. Singh ordered during 2018 to 2021. Some braces were "potentially subject" to a face-to-face encounter requirement starting in late 2019, and some are now subject to such a requirement, but none were subject to such a requirement during the relevant time period.

| HCPCS | Total Medicare payments | Subject to Face to Face Encounter Requirement in the 2018-2021 period | Subject to Face to Face Encounter Requirement as of January 2022 |
|---|---|---|---|
| L0648 | $0.943 million | No | Yes |
| L0650 | $0.551 million | No | Yes |
| L1833 | $0.136 million | No | Yes |
| L1851 | $1.743 million | No | Yes |
| L1971 | $0.126 million | No | No |
| L2397 | $0.262 million | No | No |
| L3916 | $0.431 million | No | No |
| L3960 | $0.169 million | No | Yes |

## 2. Physician-Patient Relationship

The government's witnesses were also incorrect as a matter of law when referring to the physician-patient relationship.

Medicare regulations do not define "prescriber-patient relationship," "physician-patient relationship," or "treatment." Cf. 42 C.F.R. §§ 400.200, 400.202, 400.203 (general definitions and definitions specific to Medicare and Medicaid). What constitutes a physician-patient relationship is instead defined by state law and has been litigated extensively in medical malpractice cases.

In Ohio, the physician-patient relationship has been defined by state courts and by the Ohio State Medical Board – both in ways consistent with Dr. Singh's understanding and inconsistent with the government's position at the first trial.

### a. Ohio State Law

In 2002, the Ohio Supreme Court held that a physician-patient relationship exists whenever a physician consents to act for a patient's medical benefit-even if the physician had no contact with

11

the patient. *Lownsbury v. VanBuren*, 762 N.E.2d 354, 360-61 (Ohio 2002). In that case, a patient sued a doctor for negligently supervising obstetrics residents even though the doctor had no contact with the patient. The trial court found no physician-patient relationship because the doctor lacked direct contact with the patient or active involvement in the patient's care. The Ohio Supreme Court rejected this argument:

> The basic underlying concept in these cases is that *a physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's medical benefit*. The physician-patient relationship being consensual in nature, these courts recognize that physicians who practice in the institutional environment may be found to have voluntarily assumed a duty of supervisory care pursuant to their contractual and employment arrangements with the hospital. Unlike the *traditional* personalized delivery of health care, where the patient seeks out and obtains the services of a particular physician, the *institutional* environment of large teaching hospitals incorporates a myriad of complex and attenuated relationships. Here the presenting patient enters a realm of full-service coordinated care in which technical agreements and affiliations proliferate the specialized functions and designated obligations of various allied health professionals. In this reality, the responsibility for resident supervision that rests generally with the hospital is often delegated to or assumed by an individual physician or group of physicians. It is their level of skill and competence that ensures adequate patient care. When a patient enters this setting, he or she has every right to expect that the hospital and adjunct physicians will exercise reasonable care in fulfilling their respective assignments. So it is a logical and reasonable application of the principles set forth in Tracy, 58 Ohio St.3d 147, 569 N.E.2d 875, to find that *a physician may agree in advance to the creation of a physician-patient relationship with the hospital's patients*. …
>
> Accordingly, we hold that a physician-patient relationship can be established between a physician who contracts, agrees, undertakes, or otherwise assumes the obligation to provide resident supervision at a teaching hospital and a hospital patient with whom the physician had no direct or indirect contact.

(emphasis added).

12

Courts around the country have followed *Lownsbury* in holding that doctors can have a valid physician-patient relationship even without examining patients themselves. *See, e.g., McDonald v. Shillingstad*, No. CIV 02-0594 JB/ACT, 2003 WL 27385003, at *5-6 (D.N.M. Nov. 18, 2003) (surveying cases and stating, "In circumstances like this, where the physician being consulted actually prescribes treatment for the patient rather than simply providing an informal opinion, courts have been virtually unanimous in finding that a physician-patient relationship existed"); *Kelley v. Middle Tenn. Emergency Physicians*, P.C., 133 S.W.3d 587, 596 (Tenn. 2004) ("In light of the increasing complexity of the health care system, in which patients routinely are diagnosed by pathologists or radiologists or other consulting physicians who might not ever see the patient face-to-face, it is simply unrealistic to apply a narrow definition of the physician-patient relationship in determining whether such a relationship exists for purposes of a medical malpractice case."); *Fruiterman v. Granata*, 668 S.E.2d 127, 132 (Va. 2008) (recognizing that a physician-patient relationship arises by implication when a doctor takes affirmative action to participate in the care and treatment of a patient).

### b. **Ohio State Medical Board**

Consistent with these court decisions, Ohio Administrative Code § 4731-27-02 provides that "a physician-patient relationship is established when the physician provides service to a person to address medical needs, whether the service was provided by mutual consent or implied consent, or was provided without consent pursuant to a court order." A face-to-face encounter is ***not*** required.

When the Ohio State Medical Board does require a personal examination or ongoing relationship for prescriptions, it says so explicitly. In the medical marijuana context, the Board adopted a specific definition of "bona fide physician-patient relationship" in Ohio Administrative

13

Code § 4731-32-03(A). Under this rule, a bona fide physician-patient relationship is "established through an examination of the patient by the physician either in-person or through the use of telehealth services that complies with this rule and for which there is an expectation that the physician will provide care to the patient on an ongoing basis." This definition requires both an initial examination (either in-person or via compliant telehealth services) and an expectation of ongoing care. The Board adopted this definition pursuant to its rulemaking authority under Ohio Revised Code § 4731.301 for medical marijuana certification purposes. The definition became effective on February 29, 2024.

No such requirements applied to braces during 2018-2021. Dr. Singh cannot have violated requirements that did not exist.

The government's position that a physician-patient relationship requires personal interaction was wrong. Had this case gone to trial, the government would have struggled to prove its claim in the superseding indictment that Dr. Singh knowingly and willfully made false statements about establishing a "valid prescriber-patient relationship." The government thus faced substantial risk that it could not prove the fraud and false-statement charges beyond a reasonable doubt.

### 3. **The Government's Legal Mistakes Would Not Have Been Repeated if This Case Went to Re-Trial**

Had this case proceeded to trial, Dr. Singh would have moved to preclude the government from misstating the law and Medicare requirements. Dr. Singh also would have asked the Court to preclude all testimony about legal and Medicare requirements for ordering braces and to instruct the jury accordingly.

In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overruled *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984),

14

and held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." Id. at 412. The Court announced three fundamental principles: (1) the "best" reading of a statute is the one the court-not the agency-determines is correct "after applying all relevant interpretive tools"; (2) courts, not agencies, have the expertise and competency to resolve statutory ambiguities; and (3) courts, not agencies, have the resources and expertise necessary to address technical statutory questions. Id. at 400-02.

Loper Bright's abolition of Chevron deference is especially significant in Medicare cases, where legal and regulatory requirements can be misunderstood-even by the government and its contractors-rendering it particularly important for the Court to preclude testimony that is neither reliable nor helpful to the jury while being highly prejudicial. Such testimony invites cross-examination and rebuttal concerning different interpretations of the law-something courts have held improper because it is "manifestly the role of the Court, not the jury, to consider arguments concerning the meaning of the applicable statutes and regulations and instruct the jury accordingly." United States v. Weitzenhoff, 35 F.3d 1275, 1287 (9th Cir. 1993) (reversing conviction where "[i]t was witnesses who instructed the jury on the law rather than the judge"); see also United States v. Garber, 589 F.2d 843, 849 (5th Cir. 1979) ("In our judicial system the court instructs the jury on the applicable law, and directs the jury to determine the facts from the evidence and to apply the law as given by the court to those facts.").

Once the government was precluded from making improper arguments about legal and Medicare requirements, it would have faced substantial risk that it could not prove Dr. Singh acted with knowledge that her conduct was illegal. After all, how could a reasonable jury conclude that Dr. Singh knew she was engaged in illegal conduct when her conduct was not illegal?

15

**C.** **The United States may have misunderstood what constitutes a HIPAA violation**

The government also faced substantial risk that it could not prove the elements of Count 22, the "wrongful disclosure" charge, because the government's understanding of the Health Insurance Portability and Accountability Act ("HIPAA") appears to be wrong as a matter of law.

For Dr. Singh to be convicted of violating 42 U.S.C. § 1320d-6, the government must prove that she "knowingly" used, caused to be used, obtained, or disclosed health information "in violation of this part" – meaning Part C of Subchapter XI of Chapter 7 of Title 42 of the United States Code. This part of the U.S. Code does not specify what qualifies as permissible or impermissible use of health information; instead, the government has adopted privacy standards in federal regulations.

**1.** **Unclear whether Dr. Singh was a "covered entity"**

To violate Part C, one must be subject to the rules promulgated under it. Only those who are "covered entities" subject to Part C can be prosecuted for violating 42 U.S.C. § 1320d-6. The Department of Justice acknowledged this in a 2005 memorandum titled "Scope of Criminal Enforcement Under 42 U.S.C. § 1320d-6."

The term "covered entity" is defined in 45 C.F.R. § 160.103:

1. A health plan
2. A health care clearinghouse
3. A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.

Not every health care provider qualifies as a "covered entity." Dr. Singh was a provider but would qualify as a "covered entity" only if she transmitted health information in connection with a covered "transaction" – defined as "the transmission of information between two parties to carry out financial or administrative activities related to health care." Specific examples of "transactions" include:

16

(1) Health care claims or equivalent encounter information.
(2) Health care payment and remittance advice.
(3) Coordination of benefits.
(4) Health care claim status.
(5) Enrollment and disenrollment in a health plan.
(6) Eligibility for a health plan.
(7) Health plan premium payments.
(8) Referral certification and authorization.
(9) First report of injury.
(10) Health claims attachments.
(11) Health care electronic funds transfers (EFT) and remittance advice.
(12) Other transactions that the Secretary may prescribe by regulation.

45 C.F.R. § 160.103.

Dr. Singh's work for Real Time Physicians and Expansion Media did not involve any such transactions. Her work involved reviewing patients' medical information and making medical decisions; it did not involve submitting or processing claims or other "financial or administrative activities."

The government therefore faced substantial risk that it could not prove beyond a reasonable doubt that Dr. Singh was a "covered entity" because she did not "transmit" information in connection with a covered "transaction."

### 2. Consent and authorization are not required for treatment

In paragraph 38 of the superseding indictment, the government claims that Dr. Singh's use of patient records was criminal because she used such records "without authorization from the patient." This appears wrong on two grounds – even if Dr. Singh was found to be a "covered entity" – because patient consent or authorization is *not* required for a covered entity to *treat* a patient.

When the Secretary of Health and Human Services first proposed privacy standards, the "Original Rule" required covered entities to seek individual consent before using or disclosing protected health information for routine uses such as treatment. This approach was opposed as unrealistic. As one court explained, "[T]he Secretary was inundated with unsolicited criticism,

17

principally from health care insurers and providers, warning that the Original Rule's mandatory consent provisions would significantly impact the ability of the health care industry to operate efficiently." *Citizens for Health v. Leavitt*, 428 F.3d 167, 172 (3d Cir. 2005). The "Original Rule" was then changed: "Where the Original Rule required covered entities to seek individual consent to use or disclose health information in all but the narrowest of circumstances, the Amended Rule allows such uses and disclosures without patient consent for 'treatment, payment, and health care operations'-so-called 'routine uses.'" *Id*. at 173-74.

Under 45 C.F.R. §§ 164.502 and 164.506, a "covered entity" may use or disclose protected health information "for treatment, payment, or health care operations." The Department of Health and Human Services has provided examples analogous to Dr. Singh's situation that do not require patient consent[5]:

> A covered entity may, without the individual's authorization:
>
> - Use or disclose protected health information for its own treatment, payment, and health care operations activities. For example:
>     - A hospital may use protected health information about an individual to provide health care to the individual and may consult with other health care providers about the individual's treatment.
>     - A health care provider may disclose protected health information about an individual as part of a claim for payment to a health plan. …
> - A covered entity may disclose protected health information for the treatment activities of any health care provider (including providers not covered by the Privacy Rule). For example:
>     - A primary care provider may send a copy of an individual's medical record to a specialist who needs the information to treat the individual.

---

[5]     https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/disclosures-treatment-payment-health-care-operations/index.html

> - A hospital may send a patient's health care instructions to a nursing home to which the patient is transferred.

- A covered entity may disclose protected health information to another covered entity or a health care provider (including providers not covered by the Privacy Rule) for the payment activities of the entity that receives the information. For example:

  - A physician may send an individual's health plan coverage information to a laboratory who needs the information to bill for services it provided to the physician with respect to the individual.

"Authorization" is required only for certain activities specified in 45 C.F.R. § 164.508, such as "marketing," the "sale of protected health information," and the use or disclosure of psychotherapy notes. Dr. Singh did not engage in any such conduct.

The government therefore faced substantial risk that it could not prove beyond a reasonable doubt that Dr. Singh's use of patient records violated HIPAA, because patient consent and authorization were not required for her to review charts and make medical decisions.

### D. Dr. Singh faced severe risk of deportation if she went to trial

Dr. Singh maintains that if this case went to a second trial, she likely would have won acquittal on all counts. The government's evidence of willfulness was weak, its case was premised on legal errors that would not have been repeated, and Dr. Singh was prepared to testify in her own defense. She also would have called corroborating witnesses, including Steven Richardson, the head of Expansion Media, who has admitted that he lied to doctors about how his company prepared charts.[6]

---

[6] According to Richardson's testimony in another case, he began cooperating with law enforcement after a search in April 2023. This raises potential *Brady* issues: the government did not produce any Richardson interview reports before the first trial, and this issue may have needed to be addressed if the case had proceeded to a second trial.

19

But as Dr. Singh's lawyers and the Court are aware, any jury trial carries risks. Even if Dr. Singh were acquitted on most counts, conviction on a single felony count could subject her to deportation – even if she received no additional prison time. The superseding indictment significantly increased these risks: it contains twenty-one felony counts, including crimes not charged in the complaint or original indictment.

Dr. Singh therefore asked the government to dismiss the case in light of its errors regarding willfulness and the Medicare requirements. The government refused. This was unfortunate, particularly because prosecutors "have an ongoing obligation to evaluate a case and the provable evidence, even after offenses have been charged" and "should dismiss" charges if they determine "that, as a result of a change in the evidence or for another reason, a charge is no longer readily provable or appropriate." Justice Manual § 9-27.300.

In January 2026, the government indicated willingness to resolve the case with a plea to the wrongful disclosure misdemeanor charge (Count 22).[7] Dr. Singh was open to this resolution because Count 22 does not require any admission of criminal knowledge, intent, or state of mind. Dr. Singh would never have pleaded guilty to health care fraud, false statement, or money laundering because she could not say under oath that she acted "willfully" or with intent to defraud.

Dr. Singh maintains that the government should have dismissed this case. To the extent the government seeks repayment to Medicare for braces, that can be accomplished through a civil or administrative settlement – an option Dr. Singh offered before the first trial. Given the deportation risk she would face at trial, however, Dr. Singh was willing to accept the negotiated plea

---

[7] The discussions that led to this point and the proposed agreement are described in the accompanying memorandum, which is filed under seal out of an abundance of caution.

20

agreement. If the Court rejects the plea and if the government proceeds with the case, Dr. Singh will go to trial, and she believes she will be fully acquitted.

/s/ Stephen Chahn Lee
Stephen Chahn Lee
Admitted *pro hac vice*
Attorney for Defendant
Law Office of Stephen Chahn Lee, LLC
209 S. LaSalle St, Suite 950
Chicago, IL 60604
312-436-1790
slee@stephenleelaw.com

Mark D. Wagoner
Attorney for Defendant
Shumaker
1000 Jackson Street
Toledo, Ohio 43604-5573
mwagoner@shumaker.com
419-321-1412

21